**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**SANDRA S.[1]**

                 **Plaintiff,**

     **v.**                          **Civil Action 2:21-cv-698
Judge James L. Graham
Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

               **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **AFFIRM** the Commissioner's non-disability determination and that this matter be **DISMISSED**.

## I.    BACKGROUND

In 2014, Plaintiff filed an application for Supplemental Security Income ("SSI") alleging that she became disabled on June 21, 2014. (Tr. 394). That application was denied by Administrative Law Judge Dianne S. Mantel ("ALJ Mantel") on September 14, 2017. (Tr. 391–416). The Appeals Council denied Plaintiff's request for review, making ALJ Mantel's determination final, but it appears that Plaintiff did not seek judicial review. (Tr. 417–20).

On April 23, 2018, Plaintiff protectively filed her current DIB application alleging that she became disabled on June 21, 2014. (Tr. 538–39, 540–46). After that application was denied

---

[1] Pursuant to this Court's General Order 22–01, claimants in Social Security matters are referred to by first name and last initial.

initially and on reconsideration (Tr. 423–35, 436, 437–61, 462), Administrative Law Judge Jeanine Lesperance ("ALJ Lesperance") held a hearing on March 10, 2020 (Tr. 255–90). On April 29, 2020, ALJ Lesperance issued a decision denying Plaintiff's DIB application. (Tr. 13–45). The Appeals Council denied Plaintiff's request for review, making ALJ Lesperance's decision final for purposes of judicial review. (Tr. 1–7).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on February 17, 2021 (Doc. 1), and the Commissioner filed the administrative record on July 27, 2021 (Doc. 10). The matter has been fully briefed and is ripe for consideration. (Docs. 15, 16, 21).

## A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony and statements made to the agency:

[Plaintiff] alleged that she was unable to work because of [Thrombotic thrombocytopenia purpura ("TTP")], diabetes, fibromyalgia, migraine, degenerative disc disease, depression, arthritis, sleep apnea, hypertension, mood disorder, and vertigo. At hearing, she testified that she had migraines two-to-four days per week. She estimated that she had 15-to-18 migraines per month. Her headaches were aggravated by smells and light. When she had headaches, she would lay in a dark room and reported that she would not remember things when she had headaches. She also reported that her diabetes was poorly controlled and caused her to faint. She also had fibromyalgia pain. She had problems with memory and focus. [Plaintiff] did not allege any significant side effects from medication (Exhibits B3E, B6E, B7E, and testimony).

With regard to activities of daily living, [Plaintiff] reported that she lived in a home with her husband, mother, and two adult children. She was able to drive and drove one-to-two days per week. She reported that she sometimes had difficulty showering because of migraines. On bad migraine days, she also required assistance with taking medications and getting food. She had difficulty with performing household chores, such as washing dishes, because of difficulties with maintaining focus.

(Tr. 23).

## B. Relevant Medical Evidence

The ALJ also summarized Plaintiff's medical records and symptoms related to her physical

impairments:

> The objective medical evidence does not support the extent of [Plaintiff]'s alleged symptoms and resulting functional limitations. The prior Administrative Law Judge decision found chronic pain and various orthopedic conditions, including osteoarthritis of the bilateral hips, bilateral hip trochanteric bursitis, and osteoarthritis of the bilateral knees. These conditions have persisted and osteoarthritis of the hips and knees have again been found to be severe. Additionally, the current record shows fibromyalgia, right heel spur, and lumbar degenerative disc disease (Exhibit B1A/6-7). She has remote imaging of her hips (2015) showing only mild arthritic changes (11F/6).

> During a visit with rheumatology on October 25, 2017, [Plaintiff] reported numbness throughout her extremities, but an EMG showed only possible early neuropathy. An MRI of the lumbar spine performed in April 28, 2017, showed early L5-S1 degenerative disc disease but no neuro-foraminal narrowing or spinal stenosis. She reported that her pain, including back pain, caused difficulty with sleep. She continued to complain of subjective numbness in all extremities, as well as muscle spasms and general weakness. Physical examination showed no synovitis of the MCPs or PIPs. She had crepitus of the knees with no effusion or warmth. She had tenderness over the anterior chest and discomfort with palpation over the mid and lower back. Further, she had tenderness with palpation throughout the muscles of the upper and lower extremities. She was assessed with lumbar degenerative disc disease, myalgia, and neuralgia and was started on Robaxin (Exhibits B1F/12-15 and B9F/68-71).

> When [Plaintiff] returned to rheumatology on September 27, 2018, she was assessed with polyarthralgia, lumbar degenerative disc disease, trochanteric bursitis of both hips, fibromyalgia, and neuralgia. It was noted that she had been referred to neurology and physical medicine at her last visit in October 2017, but had failed to follow up on these referrals. She had tried Robaxin, short-term, but did not find it helpful. She was taking Zanaflex but felt that she needed an increased dose. She continued to complain of numbness throughout her body and chronic pain in her right shoulder, low back, hips, and knees. Her rheumatologist increased her Zanaflex dosage for degenerative disc disease and fibromyalgia. She was again referred to a neurologist (Exhibit B9F/82-84).

> [Plaintiff] presented for a neurological evaluation on October 30, 2018, reporting numbness and tingling in the bilateral legs, numbness in the hands, and gait difficulties due to numbness. She also reported frequent falls. She had been taking Percocet for migraines for approximately twelve years. Physical examination showed no edema and no calf tenderness bilaterally. She had slight hyperesthesia on her feet to the ankles. Sensation was intact to light touch, temperature, and vibration in the upper and lower extremities bilaterally. Strength was 5/5 in the bilateral upper and lower extremities. Casual gait was normal without the use of an assistive device. Heel, toe, and tandem gaits were within normal limits. Station was

3

normal. Her neurologist determined that her symptoms were likely secondary to diabetes mellitus polyneuropathy. She was advised to keep her blood sugars under control and was referred to physical therapy (Exhibit B23F/4-10).

X-rays of the lumbar spine performed September 4, 2019, showed minimal to mild multilevel degenerative disc disease, slightly increased in the upper lumbar spine when compared to the prior exam (Exhibit B26F/7).

[Plaintiff] returned to her rheumatologist on September 4, 2019, and reported extreme mid and lower back pain. She stated that she had trouble standing for any extended length of time. She also reported trouble with maintaining hygiene because of her back pain. She had some issues with falling and feeling off balance. She had discomfort with palpation of the mid and low back, along with tenderness over each trochanteric bursa. She was referred for physical therapy (Exhibit B26F/10-12).

[Plaintiff] presented for an initial physical therapy evaluation on September 16, 2019. She was referred for six weeks of therapy and participated in sessions until October 30, 2019 (Exhibit B25F/1-5, 7-24).

On September 19, 2019, [Plaintiff] presented to the spine center for evaluation of chronic back pain. She had suffered from chronic back pain since age 18 and indicated that it had increased in severity recently. The pain involved her entire spine, but her mid to lower back was more affected. She denied any referred pain into the lower limbs and also denied weakness in the lower limbs, despite prior reports of numbness and frequent falls. Standing for several minutes resulted in increased back pain. She also had pain with walking and sitting for long periods. She rated her pain a ten in severity on a ten-point scale. Physical examination showed tenderness in the thoracic spine. The lumbar spine showed decreased range of motion, tenderness at multiple points, pain, and spasm. She had normal motor skills and strength, along with a normal gait. Straight leg raise was normal. She was assessed with chronic and myofascial pain. She was encouraged to continue with outpatient therapy, as muscle pain appeared to be her primary pain generator (Exhibit B23F/1-3).

Following the completion of physical therapy, [Plaintiff] did not again receive significant care for back pain. She was not referred for surgery and did not receive injections for her mild degenerative changes. There was little to no follow up directed at her other mild orthopedic conditions either.

[Plaintiff] has a history of diabetes mellitus with neuropathy for which she has continued to get care since the prior Administrative Law Judge decision. She presented for evaluation on November 14, 2017, after reporting several falls during physical therapy and balance issues. She had no focal weakness/numbness but had difficulty with walking. Her diabetes was noted to be poorly controlled; however, [Plaintiff] admitted that she was not fully compliant (Exhibits B5F/23-25 and

B6F/29-33). She reported that her husband "likes" her to be off her pump and to have her sugars in the 300's so that he does not have to risk calling 911 (presumably when her sugars drop too low) (B5F/23).

On November 22, 2017, [Plaintiff]'s home blood sugar readings were noted to be mostly in the low 200s. She was advised of the need to exercise and lose weight. She was to continue her diabetes medication and to do daily foot checks. When her home blood sugars were reviewed on February 13, 2018, they were noted to be mostly in the 190 range. She was provided medication adjustments (Exhibits B5F/14-17, 19-22 and B6F/34-38, 43-47).

On April 26, 2018, [Plaintiff] presented to the emergency department with hyperglycemia. She had a history of insulin-dependent diabetes with insulin pump. In the emergency room, she was awake but minimally responsive. Her glucose was 31. After administration of glucagon and dextrose, she stated that she had not eaten adequate amounts of food that day. Laboratory work was unremarkable with no signs of infection on exam. She was discharged with a diagnosis of acute hypoglycemia, secondary to insulin use without adequate oral intake (Exhibits B3F/2-4 and B10F/1-10).

On June 28, 2018, [Plaintiff]'s home blood sugars were reviewed and were noted to be elevated between 100 and 400. She stated that she adhered to her medication regimen and was frustrated with weight gain and poorly controlled diabetes. She was to stop the insulin pump and start long-acting injection with mealtime insulin (Exhibits B6F/63-67 and B16F/19-22).

In July and August 2018, [Plaintiff] experienced labile blood sugars. However, on August 10, 2018, she reported that she was doing much better with blood glucose control after recent adjustments in medication. Her A1C was 10.9, down from 12.0 (Exhibit B16F/13-19).

On September 6, 2018, [Plaintiff] reported excellent compliance with her diabetes medication regimen. However, sugars ranged from 67-to-147, and she had a significant number of blood sugars below 80. She had not made any changes to diet or exercise. She was again provided medication adjustments. Her A1C on October 18, 2018, was 6.9. She was continued on medications (Exhibit B16F/4-6, 11 and B22F/86).

On January 17, 2019, [Plaintiff] was shaking and was noted to have a fasting blood sugar of 55. She had missed breakfast that day and only took her long-acting insulin the previous night. She was given crackers and juice for hypoglycemia. However, her blood sugars were note to be excellent on January 23, 2019. She had excellent compliance with medications. She was continued on medications (Exhibit B22F/74-81).

[Plaintiff] presented to the weight management clinic on February 12, 2019. Her body mass index ("BMI") was 40.5. She stated that she had been overweight since she started taking Metformin for diabetes. Prior to starting Metformin, she weighed 145 pounds. She stopped Metformin a couple of years ago. She was advised of the need to exercise and was referred to a dietician (Exhibit B22F/67, 72).

On March 19, 2019, it was noted that [Plaintiff] had lost 16 pounds since February 12, 2019. She had replaced sweet tea with water and was going to the YMCA twice a week. She was started on Wellbutrin (Exhibit B22F/57, 60).

[Plaintiff] was again noted to have excellent home blood sugars on April 10, 2019. She was continued on medications (Exhibit B22F/49-54).

On April 16, 2019, [Plaintiff] reported that she had stopped Wellbutrin because her blood pressure was getting too low. She had increased physical activity with walking and swimming two days per week. On May 15, 2019, she had gained one pound. Her BMI was 37.71. She was started on phentermine and was advised to continue with exercise and diet management (Exhibit B22F/36-40, 44-48).

It was noted on June 14, 2019, that [Plaintiff] had lost ten pounds in the first month of taking Adipex. Her BMI was 35.6. It was noted that she was very stressed, caring for her ill mother. She was noted to have gained two pounds on July 8, 2019, after two months of Adipex use. Despite the weight gain, she felt that medication was helpful. She was going through a stressful time with her mother and felt she would have gained 20 pounds if she were not taking it. She was continued on Adipex. On August 5, 2019, she was noted to have lost about three pounds (Exhibit B22F/18, 23-33).

[Plaintiff]'s blood sugars were again noted to be excellent on August 21, 2019. However, on October 15, 2019, she had gained four pounds. She had completed Adipex in August. She stated that she had been falling down due to balance issues/arthritis and was not exercising. Her blood sugars were ranging between 72 and 148. Her BMI was 36.54. She was advised to continue with diet management and was to add yoga to her activity goals (Exhibit B22F/4-14).

On November 14, 2019, [Plaintiff]'s diabetes was noted to be usually well controlled. The normal range of her home blood sugars was in the low 100s. She was restarted on phentermine on February 17, 2020 (Exhibits B27F/8-9 and B33F/8).

Despite lability in [Plaintiff]'s blood sugars in the early record, her most recent treatment records show that she had much better control with insulin and medication. She continued to work on losing weight and was working on being more active. Her more limiting signs and symptoms of diabetes occurred rarely in the context of acute exacerbations often with mismanagement in terms of medication and dietary compliance.

The prior Administrative Law Judge decision and the current record also shows continued follow-up for TTP, although this condition was very well-controlled. She presented to the hematology clinic on October 12, 2017, and was noted to have long-term complications associated with TTP, including short-term memory loss, mood disorder, and chronic headaches. However, she did not have any actual TTP episodes since her initial diagnosis in 2006 (Exhibit B5F/37-38).

[Plaintiff] again reported complications from TTP on January 4, 2018, including chronic headaches, neurocognitive deficits, mood disorders, and depression. She had no acute complaints at that time but did continue to have chronic headaches. She continued to do well and maintained a continuous remission of her TTP without acute relapse or other difficulties (Exhibits B5F/18-19 and B6F/41-42).

On April 5, 2018, [Plaintiff] complained of migraine pain rated a six in severity on a ten-point scale. Further, on April 21, 2018, she presented to the emergency room for migraine headaches with photophobia. During her brief stay, she improved significantly with home Percocet and Zofran (Exhibits B5F/11-12 and B6F/50-51, 53-56).

On July 5, 2018, [Plaintiff] was again noted to be doing well in terms of her TTP. On October 11, 2018, she reported daily headaches and some blurred vision/migraines. Neurological examination was unremarkable. She continued to have no relapses of TTP. Her Inderal dosage was increased on January 23, 2019, secondary to headaches (Exhibits B6F/69-70; B14F/1-3; B16F/7-9; and B22F/78, 87-89).

On May 16, 2019, [Plaintiff] reported that she was doing well and was in good spirits. She felt well with no acute complaints or problems. She was managing quite well. She had started a weight loss program and was starting to feel better. She was doing well with ADAMTS13 activity, suggesting a lower risk of recurrence of her TTP (Exhibit B22F/34-35).

[Plaintiff] reported on August 15, 2019, that she was having a migraine (Exhibit B22F/15). However, she appeared timely for her appointment and was noted to be in no acute distress with an appropriate mood and affect, normal range of motion in her extremities, no gross focal neurological deficits, and a normal exam other than some contact dermatitis at the site of her prior skin sensor and tourniquet sites on her bilateral arms and some faint bruising near her left elbow (Id./16).

On November 7, 2019, it was noted that she was doing well controlling the long-term complications of TTP, including mood disorders. Her coping mechanisms for neurocognitive deficits were improving. On February 20, 2020, it was again noted that she was doing well enough on her chronic regimen of oxycodone for headaches (Exhibits B22F/2-3 and B32F/10-11).

[Plaintiff]'s main complaint at hearing was debilitating migraine headaches. Treatment records, however, in no way support the frequency or severity of her alleged headaches. She testified she has 15-18 headaches per month that last from two-to-four days each. She also reported that she had, at most, four good days per month. This would mean she essentially has a migraine all the time. She also says that headaches are so terrible that she has to lay in a dark room without light or sound; she could not watch television or be outdoors. However, at her many doctor appointments, she consistently presented normally with no distress. She testified that she has tried many medications in the past, along with Botox, but nothing has worked. The current record shows that she has been treated consistently with Percocet. She also complains of severe memory loss with episodes of not remembering things that happened, such as a trip to the emergency room in the period just prior to her hearing. But, again, her medical records do not support this, and if she made these complaints consistently one would expect a neuropsychological workup or possible therapy directed at memory training. As discussed below, she is able to participate in counseling and share things happening in her life. She is able to provide medical histories. She canceled some appointments due to having a headache (see, e.g. Exhibit 8F) but these occasions are relatively rare. When seen alleging a headache, her presentation was fairly normal. For example, in Exhibit B22F/15-16, she reported having a migraine since "an hour ago" but her physical examination was totally within normal limits other than some contact dermatitis and elbow bruising. At Exhibit 5F/7, when seen in the emergency department for a migraine, she was in no distress with a normal exam, and her symptoms were quickly ameliorated with medication. When seeing neurology for a headache follow up, she was in no apparent distress with normal, detailed neurological exam other than some evidence of neuropathy from diabetes mellitus in her feet and ankles. Only conservative care was recommended in the form of controlling her sugars better and doing physical therapy (Exhibit 23F/4, 9).

The record also contains little objective evidence to support her pain complaints. Her imaging showed only early/mild degenerative changes. Her EMG showed only possible early neuropathy. Her rare abnormal examination findings vary considerably, suggesting her symptoms might be more episodic than chronic. For example, a neurological exam performed October 30, 2018, (23f/9) found some sensory abnormalities in the feet and ankles, but in follow up for diabetes with her primary care provider on May 17, 2019, she had normal sensation to monofilament testing with no pain or signs of discomfort. When she complained to rheumatology that she was having "extreme back pain," she was in no distress. Her exam was normal other than some tenderness to palpation and crepitus (Exhibits 26F/10-11 and 27F/4).

Additionally, treatment records showed some complaints of nausea and vomiting, but there is no evidence that these conditions are chronic. The record does not demonstrate unintentional weight loss or the need for hospitalization for dehydration. I note that her TTP provider appeared to believe that she lost twenty pounds unintentionally due to her reports of difficulty eating with nausea. However,

only three days before this appointment she saw her nutritionist and was noted to be on a long-term managed weight loss plan. This evidence demonstrates that she was intentionally working to lose weight, but did not mention this to her TTP provider (Exhibit 33F/3).

(Tr. 24–29).

The ALJ also summarized Plaintiff's medical records and symptoms related to her mental impairments:

With respect to [Plaintiff]'s psychological conditions, the objective medical evidence again does not support the extent of [Plaintiff]'s alleged symptoms and resulting functional limitations. On October 2, 2017, she reported depression with isolated suicidal ideation. She denied any intent or plan and was agreeable to beginning counseling. However, she presented to the emergency department on October 12, 2017. She felt depressed because her application for disability benefits had been denied and had thoughts of taking too much insulin. Depressive symptoms included depressed mood, poor concentration, guilt, and chronic sleep disturbance.

She had some situational anxiety. Mental status examination showed frustration and anger about being in the emergency room but was otherwise appropriate. She denied any active suicidal ideation. She then denied the sincerity of her earlier reports of suicidal ideation. She was discharged home after being found at low risk of imminent harm to herself or others (Exhibits B5F/30-38 and B6F/17-27).

On November 7, 2017, [Plaintiff] presented for a diagnostic assessment. She reported depression with low self-esteem, self-confidence, and self-worth, along with suicidal ideation. She also had anxiety with concentration, focus, and memory impairments. She described frequent anger with mood swings and verbal/physical aggression. Her symptoms had been present since her father's death in 2003. She felt overwhelmed by family responsibilities and her physical health problems. She felt on edge because of current life stressors. Mental status examination showed her to be fully oriented with rambling speech. Her affect was labile, and motor activity was restless. Her mood was anxious. She had preoccupied thought processes and flight of ideas. Thinking was concrete, and she had no abnormal thought content. Intellectual functioning was estimated, however, to be average. Concentration was moderately impaired, as was memory. She was referred for counseling and would continue medication management through her primary care physician (Exhibit B7F/1-16).

On a November 22, 2017, visit with her primary care provider, [Plaintiff]'s overall mood was noted to be excellent. She stated that Cymbalta was very effective. She had no suicidal or homicidal ideation (Exhibits B5F/19-22 and B6F/34-38).

9

When [Plaintiff] began counseling sessions in late November 2017, she frequently reported that she was not receiving much help at home and that she felt overwhelmed with demands placed on her by her family. She also reported financial worries and stress related to her physical health. However, she reported on December 14, 2017, that she had reduced depression, anger, and anxiety. She was doing better with getting out of the house more to take time out for herself. She had noticed a difference with improved mental state and feeling more relaxed (Exhibits 7F/33-34 and B8F/5, 7). I note that her complaints of being overwhelmed with demands placed on her and getting little help at home are not consistent with her other reports of doing little regularly around the house or needing extensive time in quiet or dark rooms to recover from headaches.

On December 15, 2017, [Plaintiff] reported that she continued to struggle with relationship difficulties. She was working on anger management techniques. She continued to do well with leaving her house for breaks and to take time for herself. She had noticed significantly improved overall mood stability (Exhibit B8F/12).

[Plaintiff] reported on January 3, 2018, that she had improved sleep. On January 17, 2018, she reported that therapy had helped to reduce her stress levels. On February 7, 2018, she reported that she was recovering from a fall down the stairs but was otherwise doing well physically and mentally. She felt that therapy was helping to maintain improved overall mood stability (Exhibits B7F/39 and B8F/16-17, 25).

On February 13, 2018, [Plaintiff] reported that her overall mood was excellent. She again reported that Cymbalta was very effective. She had no suicidal or homicidal ideation. She was continued on Cymbalta. On March 15, 2018, she reported good and bad days with sleep, largely because of her chronic medical conditions. She also had a lot of daily stress related to her family (Exhibits B5F/15-17, B6F/43-47, and B8F/36-37).

[Plaintiff] returned to her primary care physician on June 28, 2018. It was noted that her mood was "not great" overall. She was frustrated with weight gain and poorly controlled diabetes. She was continued on Cymbalta (Exhibit B16F/19-22).

[Plaintiff]'s therapy records continued to show fluctuations in her mood. While she generally reported good benefit from Cymbalta, she also reported waxing and waning mental health symptoms largely related to situational stressors. On February 17, 2019, she was noted to have made some progress trying to set healthy boundaries and assertiveness. Mental status examination showed that her intellectual functioning appeared average. Her mood was cooperative, anxious, labile, depressed, and irritable. Her affect was primarily appropriate. Her speech was rapid/pressured. Thought content showed flight of ideas. Her behavior was agitated/tense and restless/overactive. She was fully oriented and had good insight. Her memory was good. On February 15, 2020, she was again noted to have made significant progress in more effectively handling mood stability and daily stressors.

10

She was reported and/or observed to have reduced depression, anger, anxiety, and stress (Exhibits B8F/59-60 and B30F/2-21).

(Tr. 29–31).

### C.    The ALJ's Decision

ALJ Lesperance initially noted that Plaintiff had previously filed an SSI application that had been denied by ALJ Mantel.  (Tr. 16).  ALJ Lesperance also noted, however, that Plaintiff had submitted new and material evidence documenting a change in her condition, and therefore, she would not adopt ALJ Mantel's prior findings for the unadjudicated period that began after ALJ Mantel's determination was issued.  (*Id*.).  Still, the ALJ noted that Judge Mantels' decision was binding and final with respect to the prior claim.  (*Id*.).

ALJ Lesperance next determined that Plaintiff had last met the insured status requirement on December 31, 2019, and that Plaintiff had not engaged in substantial gainful employment from her alleged onset date of June 21, 2014, through her date last insured.  (Tr. 19).  ALJ Lesperance also determined that Plaintiff had the following severe impairments: fibromyalgia, type II diabetes mellitus with neuropathy, TTP, migraines, obesity, osteoarthritis of the hips and knees, right heel spur, lumbar degenerative disc disease, depressive disorders, and anxiety disorders.  (*Id.*).  Nevertheless, ALJ Lesperance determined that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment.  (Tr. 20).

ALJ Lesperance also assessed Plaintiff's residual functional capacity ("RFC") as follows:

After careful consideration of the entire record, [the ALJ] finds that, through the date last insured, the [Plaintiff] had the residual functional capacity to perform a range of work between sedentary and light work as defined in 20 CFR 404.1567(b) subject to the following limitations. [Plaintiff] could stand and/or walk four hours in an eight-hour workday; occasionally climb ramps or stairs; occasionally be exposed to vibration in the bilateral lower extremities; occasionally operate foot controls, push, and pull with the bilateral lower extremities; never climb ladders, ropes, or scaffolds; and never work around hazards, such as unprotected heights or work in proximity to exposed, moving mechanical parts. Work activities should not require balancing, as specifically defined in the Selected Characteristics of

> Occupations ("SCO"), but she can balance without limitation as needed to stand or walk. She should avoid exposure to unusually strong odors, bright sunlight, and loud noise. Mentally, she could perform simple and moderately complex tasks at an average pace without strict time or production demands; interact constantly with others on matters limited to straightforward exchange of information without negotiation, persuasion, or conflict resolution; and adapt to occasional changes in a routine work setting.

(Tr. 22–23).

Upon "careful consideration of the evidence," ALJ Lesperance found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . " (Tr. 23–24).

Relying on a vocational expert's ("VE's") testimony, ALJ Lesperance concluded that Plaintiff was unable to perform her past relevant work as a nurse aide, claims clerk, or hospital admitting clerk but that she could perform other jobs that existed in significant numbers in the national economy. (Tr. 37–39). ALJ Lesperance thus concluded that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from June 21, 2014, the alleged onset date, through December 31, 2019, the date last insured (20 CFR 404.1520(g))." (Tr. 39).

## II.  STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.   DISCUSSION

Plaintiff alleges two assignments of error. Plaintiff first contends that ALJ Lesperance failed to properly evaluate the opinions provided by treating physicians, Michael Langan, M.D. and Spero Cataland, M.D. (Doc. 15 at 8–15). Plaintiff next alleges that 42 U.S.C. § 902(a)(3), which limits the President of the United States' power to remove the Commissioner of Social Security without cause, violates the separation of powers doctrine, and thus, the Commissioner's delegation of power to the ALJ who adjudicated her claim was defective. (*Id.*, at 15–19; Doc. 21 at 5–29). These assignments of error are each addressed in turn.

### A.   Medical Opinion Evidence

Plaintiff alleges that ALJ Lesperance committed reversible error when considering medical opinions from Drs. Langan and Cataland.

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in his or her case file. *Id.* The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical

findings.[2]   20 C.F.R. §§ 404.1513(a)(1)–(5); 416.913(a)(1)–(5).[3]   Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from the claimant's medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." § 404.1520c(c)(1)–(5). Although there are five factors, supportability and consistency are the most important, and an ALJ must explain how they were considered. § 404.1520c(b)(2).  And although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so. *Id*.  If, however, an ALJ "find[s] that two or more medical opinions or prior administrative findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ will] articulate how [he or she] considered the other most persuasive factors . . . . . " § 404.1520c(b)(3).

---

[2] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§ 404.1513(a)(2), (5).

[3] Because her current DIB application was filed after March 27, 2017, it is governed by new regulations describing how evidence is categorized, considered, and articulated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c (2017).

In addition, when a medical source provides multiple opinions, an ALJ need not articulate how he or she evaluated each medical opinion individually. § 404.1520c(b)(1). Instead, an ALJ must "articulate how [he or she] considered the medical opinions . . . from that medical source together in a single analysis using the factors listed [above], as appropriate." *Id.*

1. Dr. Langan

Plaintiff contends that ALJ Lesperance erred when considering Dr. Langan's October 30, 2018, opinion. (Doc. 15 at 9–12). The regulations applicable here require that an ALJ provide a "coherent explanation of his reasoning." *Lester v. Saul*, No. 20-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom. Lester v. Comm'r of Soc. Sec.*, No. 20-1364, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021). As one Court recently explained,

> The new regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'" *Warren I. v. Comm'r of Soc. Sec.*, No. 20-495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)). An "ALJ's failure . . . to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021).

*Hardy v. Comm'r of Soc. Sec.*, No. 20-101918, 2021 WL 3702170, at *4 (E.D. Mich. Aug. 13, 2021).

The ALJ satisfied that standard here. First, she accurately summarized Dr. Langan's opinion as follows:

> Michael [Langan],[4] M.D. completed a form titled Physical Medical Source Statement on October 30, 2018. Dr. [Langan] opined that the claimant could walk one city block. She could sit for 30 minutes at one time and stand for 30 minutes at one time. She could stand/walk for less than four hours in an eight-hour workday

---

[4] The ALJ listed Dr. Langan's last name as Langah based on his signature at Tr. 1457, but the records reflect that Dr. Langan's last name is spelled with an "n". *See, e.g.*, Tr. 1106.

and could sit for less than four hours total in an eight-hour workday. She required the ability to walk every 30 minutes for ten minutes at a time. She required a job that allowed for shifting position, at will, from sitting, standing, or walking. She could rarely lift and carry less than ten pounds. She would be absent from work about two or more days per month, would be off task 25 percent of the workday, and required unscheduled breaks every one-to-two hours.

(Tr. 33).

Then, ALJ Lesperance determined that Dr. Langan's opinion was not persuasive.  She

explained her reasons for arriving at that conclusion:

The opinions of Dr. [Langan] are not persuasive to support work preclusive physical limitations, as they are not consistent with the objective evidence of record. Although Dr. [Langan]'s form was signed in October 2018 and indicated that he had treated [Plaintiff] since 2015, it appears that Dr. Cook more often saw [Plaintiff] in the practice, e.g. she saw Dr. Cook on October 1, 2018 and in 2019, both before and after this opinion form was provided. Any historical records of treatment from Dr. [Langan] that are not exhibited were thoroughly reviewed and considered by the prior Administrative Law Judge, and there is no basis to re-examine them. The physical exam of Dr. Cook performed just a few weeks prior to the completion of this form was completely normal other than obesity. She reported no joint pain or shortness of breath when walking. Further, she was healthy appearing and ambulating normally. She had good judgment, a normal mood and affect, and was active and alert. She was treated for routine conditions including hypertension, hyperlipidemia, and diabetes. When she was next seen on May 17, 2019, she again reported no fatigue; a normal activity level; and no numbness, weakness, tingling, nausea, vomiting, or swelling. Her physical exam was entirely normal, with a normal gait and stance and normal sensation to monofilament. In general, she showed no pain or signs of discomfort and was healthy appearing. The same generally normal examination was noted on November 14, 2019 (Exhibits B12F/1, 3-4; B15F; and B27F/4, 9).

(Tr. 33–34).

Plaintiff asserts that ALJ Lesperance failed to satisfy the articulation requirement because she did not address the supportability factor enough.  The Undersigned disagrees.  ALJ Lesperance expressly noted that when Dr. Langan rendered his opinion, Dr. Cook (not Dr. Langan) was treating Plaintiff with more frequency.  So Dr. Langan's records were of less value because they were dated.  Then, ALJ Lesperance carefully tracked Dr. Cook's records which show Plaintiff's

unremarkable physical examinations.  (Tr. 34).

Additionally, elsewhere in the opinion, ALJ Lesperance noted some of Dr. Langan's own records showing Plaintiff to be more physically able than Dr. Langan's October 30, 2018, opinion suggested:

> For example, Dr. [Langan] notes at exhibit 6F/3-5, in "review of systems," that she was negative for headache, gait disturbance, and weakness.  Physical examination is normal other than obesity, she appears well, and is in no acute distress.  Physical examination at Exhibit 6F/7 notes her to be uncomfortable and in pain but in no acute distress with mild obesity and no other abnormal findings.

(Tr. 37).  *See Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (noting that the ALJ's decision should be read as a whole); *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (affirming ALJ evaluation of opinion where "[e]lsewhere in her decision, the ALJ laid out in detail the treatment records" undercutting the opinion).

All told, the ALJ explained why she found Dr. Langan's opinion to be unsupported and inconsistent, and substantial evidence supports her conclusion.

## 2.  Dr. Cataland

Plaintiff also argues that ALJ Lesperance improperly discredited Dr. Cataland's opinion. (Doc. 15 at 13–15).  The Undersigned does not so find.

ALJ Lesperance summarized Dr. Cataland's opinion contained in a Medical Source statement dated November 23, 2018.

> Spero Cataland, M.D. completed a form titled Mental Impairment Questionnaire Medical Treating Source Statement on November 23, 2018. Dr. Cataland assessed moderate limitation in understanding, remembering, or applying information and moderate limitation in concentrating, persisting, or maintaining pace because of her TTP diagnosis and cognitive impairment. Her symptoms were severe enough to interfere with the attention, concentration, and pace to perform simple tasks frequently. She would be absent from work about two or more days per month. She would be unable to sustain work beyond three months.

(Tr. 35).  ALJ Lesperance next summarized a letter authored by Dr. Cataland on September

2, 2019:

> Dr. Cataland later provided a letter dated September 2, 2019. In that letter, Dr. Cataland noted no recent, acute TTP but stated that she had long-term complications from the condition, including mood disorder, depression, short term memory loss, and neurocognitive deficits. Dr. Cataland opined that she was disabled and could not be employed.

(*Id.*). ALJ Lesperance then discounted Dr. Cataland's opinions and explained why she did so:

> Dr. Cataland's treatment notes and the record generally do not support his opinions. Dr. Cataland is a specialist in hematology, yet his opinions are directed primarily at her mental health limitations, and he has not treated her for mental health issues. He notes that there may be complications from TTP such as hypertension and renal insufficiency that impact her ability to work. Nevertheless, while she is treated for hypertension by her primary care doctor, her pressure is typically well controlled when she is compliant with her medications, and her primary care doctor does not note functional losses from her hypertension, nor does the record indicate significant renal disease or functional losses arising therefrom. From a mental health perspective, the letter at 21F recites long-term complications of TTP that are reported in the medical literature and asserts that she has suffered from such complications. However, his own notes and the record generally do not support short-term memory loss or neurocognitive deficits. He reports in this letter that [Plaintiff] has had neurocognitive evaluation done as part of an ongoing study, but these findings are not documented in the record or Dr. Catalan[d]'s treatment notes. While he states at 21F that "it is very clear that she cannot be gainfully employed and is disabled," he does not actually identify specific functional losses that arise from her mood disorder, reported memory loss, anxiety, hypertension, or kidney disease. Moreover, his impairment questionnaire at 17F is not fully consistent with his conclusions in 21F, as he notes only "moderate" limits in understanding, remembering or applying information or in concentration, persistence or pace, with no limits noted (blank) in the social and adapt/manage domains. He also acknowledges that she does not have a case manager, that she drives, does not miss appointments, has very good hygiene, and can manage her own benefits. These activities do not support such severe cognitive deficits to preclude the range of work identified in the residual functional capacity. He then states that her symptoms would "frequently" interfere with attention, concentration, persistence and pace and she would be absent two or more days per month. These opinions are inconsistent with his earlier opinion that she is only moderately limited in concentration, persistence, or pace. His own examinations are nearly uniformly normal, citing, at most, some appearance of fatigue, e.g. 33F/3 and 32F/11 "mildly fatigued appearing." However, at 22F/2, 34, 80 her examinations are totally within normal limits. She appears to present alone at her appointments and the doctor does not indicate that a family member must be present to relate her interim history or be responsible for any changes in treatment. His opinions are also, like Dr. [Langan]'s, inconsistent with other medical findings, such as when she is seen at the emergency

room, where she is also noted to have generally normal examinations once her acute issues are resolved, both physically and mentally, e.g. 10F/8. Finally, Dr. Cataland does not explain why, when she was diagnosed with TTP back in 2002, her long-term complications did not preclude work through 2014 but then suddenly did thereafter. His own notes do not indicate disease progression (Exhibits B17F and B21F).

(Tr. 35–36).

The Undersigned finds no error in the analysis. ALJ Lesperance explained that Dr. Cataland's opinion lacked record support for several reasons. First, ALJ Lesperance noted that even though Dr. Cataland was a hematologist, his opinions pertained to Plaintiff's mental health limitations, for which he did not provide Plaintiff treatment. The record supports that explanation—Dr. Cataland is a hematologist; he referred Plaintiff to Dr. Langan for treatment of her mood disorders (Tr. 793); and he noted that under Dr. Langan's "excellent care" Plaintiff did much better with her mood disorders, blood sugar, and hemoglobin (Tr. 785, 784, 757, 1145, 1164, 1574).

ALJ Lesperance also discounted Dr. Cataland's opinions because Dr. Cataland noted that TTP complications like hypertension might impact Plaintiff's ability to work, but records from Plaintiff's other doctors showed that Plaintiff's blood pressure was well controlled. The record also supports that explanation. Although Dr. Cataland noted that Plaintiff's blood pressure was out-of-range on two occasions, he also noted that she had not taken her blood pressure medications at those times. (Tr. 1541, 1573). Moreover, Plaintiff's other providers regularly noted that Plaintiff's blood control goals were being met while she was medication compliant. (Tr. 1097, 1105, 1129–30, 1139, 1159, 1589).

Similarly, ALJ Lesperance found Dr. Cataland's opinions lacked support because even though Dr. Cataland cited concerns about Plaintiff's abilities being impacted by TTP complications like renal disease, the record lacked evidence indicating that Plaintiff suffered from

19

any significant renal disease or functional losses from the same. That accurately describes the record which is bereft of such information. ALJ Lesperance also explained that Dr. Cataland's opinions lacked support because his September 2, 2019, letter cited results from a neurocognitive evaluation done during an ongoing study, but his treatment notes do not contain or describe those study results. That too describes the record accurately.

Further, ALJ Lesperance correctly noted that Dr. Cataland's records reflected that Plaintiff's condition was generally normal. The record supports that explanation. Dr. Cataland regularly wrote that Plaintiff was doing well with her TTP, had no sign of TTP relapse, her TTP was stable or well controlled, or that Plaintiff was more functional. (Tr. 818, 803, 797, 793, 784, 1102, 757, 731, 1145, 1164, 1573, 1555–56, 1542, 1790–91, 207, 221, 135, 1763). ALJ Lesperance also noted that Dr. Cataland's opinion failed to explain why Plaintiff was able to work for 12 years after she was diagnosed with TTP, but that she became unable to work thereafter. That observation enjoys substantial record support—Dr. Cataland's notes do not reflect that Plaintiff's condition worsened. Indeed, his notes generally reflect that Plaintiff's condition was stable or well controlled, that she was in remission, she had no signs or symptoms of relapse, she had progressed favorably, and should continue to improve. (Tr. 797, 785–86, 784, 770, 1096, 757, 779, 731, 1145, 1573, 1542, 1790–91, 207, 221, 1763).

ALJ Lesperance also explained that Dr. Cataland's opinions were not consistent with other record evidence which contained generally normal examination findings. The record supports that explanation. Examinations by other providers found that Plaintiff had normal attention and concentration (Tr. 1638), or that Plaintiff reported that she was negative for decreased concentration (Tr. 134, 220). Despite her mood disorder, which Dr. Cataland described in his notes as one of Plaintiff's chronic issues stemming from her TTP (Tr. 793), providers routinely

20

noted that Plaintiff's mood and/or affect was normal, appropriate, or good (Tr. 662, 1360, 1692, 1464, 1619, 131, 216, 235, 1546, 1560, 1570, 720, 1151, 703, 1638, 748, 1631, 773, 1332, 158). And although Dr. Cataland opined that Plaintiff had moderate memory impairments, other examiners found that Plaintiff had grossly normal recent and remote memory (Tr. 1638), or that her memory was intact (Tr. 749).

In short, ALJ Lesperance considered the supportability and consistency factors and found them lacking. She also provided record-based reasons for that finding. Accordingly, ALJ Lesperance did not commit reversible error when assessing Dr. Cataland's opinions. Plaintiff's claim to the contrary lacks merit.

## B. Separation of Powers

Plaintiff also contends that remand is required because a statute that provided tenure protection to the former Commissioner of Social Security, Andrew Saul, violated the separation of powers doctrine, and therefore, the decision to deny her benefits was made by individuals who lacked a proper delegation of power to make such determinations. This contention lacks merit.

### 1. Plaintiff's Constitutional Claim is Procedurally Improper

As an initial matter, the claim is procedurally improper. Plaintiff's Complaint does not include any Constitutional claims. (Doc. 1–2; Doc. 4). Rule 8(a)(2) of the Federal Rules of Civil Procedure provides, however, that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although a complaint need not provide "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At a minimum, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id*. Here, the United States Supreme Court case

upon which Plaintiff bases her Constitutional claim was decided on June 20, 2020. Yet Plaintiff gave no notice, let alone fair notice, of her Constitutional claim in her February 17, 2021, Complaint. *See John R. v Comm'r of Soc. Sec.*, Case No. C20-6176-MLP, 2021 WL 5356719, *7 (W.D. Wash. Nov. 16, 2021) (finding that a plaintiff failed to comply with Rule 8 by failing to plead a separation of powers claim in complaint seeking judicial review of Commissioner's decision to deny benefits); *Shannon R. v. Comm'r of Soc. Sec.*, Case No. C21-5173, 2021 WL 5371394, at * 6–7 (Nov. 18, 2021) (same). For that reason, she failed to comply with Rule 8.

2.     Plaintiff's Constitutional Claim Lacks Merit

But even if Plaintiff's Complaint was rule compliant, her Constitutional claim lacks substantive merit. Removal of the Commissioner is governed by 42 U.S.C. § 902(a)(3) which provides that the Commissioner may only be removed from office "pursuant to a finding by the President of neglect of duty, malfeasance in office." *Id*. The parties agree that two recent United States Supreme Court cases cast doubt on the constitutionality of that provision.

In *Seila Law LLC v. Consumer Financial Protection Bureau*, the Supreme Court held that a provision that allowed the president to remove the Director of the Consumer Financial Protection Bureau ("CFPB") only for "inefficiency, neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers doctrine by insulating the director from removal by the President. 140 S.Ct. 2183, 2197 (2020). In *Collins v. Yellin*, decided one year later, the Supreme Court held that a provision limiting the President to removing the Director of the Federal Housing Finance Agency ("FHFA") only for cause similarly violated the separation of powers doctrine. 141 S.Ct. 1761, 1783 (2021) (holding that "*Seila Law* is all but dispositive"). Plaintiff asserts that like the Directors of the CFPB and the FHFA, the Commissioner of Social Security is a single officer at the head of an administrative agency, and therefore, §902(a)(3)'s attempt to

impose any restraints on the President's power to remove the Commissioner also violates the separation of powers doctrine. The Commissioner agrees. (Doc. 16 at 7) (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)).

Plaintiff further asserts that because this removal provision is unconstitutional, any delegations of power by Former Commissioner Saul, including delegations of authority to ALJs or the Appeals Council who determined her benefits claims, were invalid. The Commissioner contends that Plaintiff's argument fails because the ALJ who determined Plaintiff's claim on April 29, 2020, held office on that date, not because of a delegation of authority from Former Commissioner Saul, but because of a ratification of delegated authority on July 16, 2018,[5] by Former Acting Commissioner Nancy Berryhill. (Doc. 16 at 9–10). And the Commissioner correctly notes that an Acting Commissioner is not subject to § 902(a)(3)'s removal provision, and therefore that provision's constitutionality, or lack thereof, is irrelevant. *See Collins*, 141 S.Ct. at 1781 (because the FHFA removal restrictions only applied only to the Director, "any constitutional defect in the provisions restricting the removal of a confirmed Director would not have harmed [the plaintiffs], and they would not be entitled to any relief" from actions of the Acting Director who enjoyed no such removal protections); *Thomas E. v. Comm'r of Soc. Sec.*, C21-5107-BAT, 2021 WL 5415241, *5 (W.D. Wash. Nov. 19, 2021) (finding no constitutional injury where ALJ's

---

[5] In *Lucia*, the Supreme Court found that the United States Security Exchange Commission (SEC) ALJs were "inferior officers" under the Appointments Clause, U.S. Const. art II, § 2, cl. 2, and therefore, had to be appointed by a President, a court, or the head of an agency instead of lower-level staff. *Lucia v. S.E.C.*, 138 S.Ct. 2044, 2051 (2018). Although *Lucia* involved ALJs at the SEC, on July 16, 2018, Acting Commissioner Berryhill ratified the appointment of the Social Security Administration's ALJ's and administrative appeals judges who were previously appointed by lower- level staff in response to the ruling in *Lucia*. See SSR 19-1p, 84 Fed Reg. 9582, (2019).

appointment was ratified by Acting Director Berryhill who, as Acting Director, was not subject to the removal provision in § 902(a)(3)); *Alice T. v. Comm'r of Soc. Sec.*, 8:21CV14, 2021 WL 5302141, *18 (D. Neb. Nov. 15, 2021) (same); *Boger v. Kijakazi*, No. 1:20-cv-00331-KDB, 2021 WL 5023141, * 3 n.4 (W.D.N.C Oct. 28, 2021) ("Plaintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because [the ALJ] was appointed by an Acting Commissioner of Social Security who could be removed from the office at the President's discretion.") (emphasis in original).

Nevertheless, Plaintiff asserts that "it is uncontested" that the ALJ and the Appeals Council adjudicated her disability application pursuant to a delegation of authority from Former Director Saul. (Doc. 21, at 5 n.2). The Court need not resolve this factual dispute but finds instead that even if Former Director Saul appointed the ALJ and Appeals Council judges[6] who determined Plaintiff's benefits claim, the constitutionality of § 902(a)(3) would not warrant remand for several reasons.

First, even if the removal provision in § 902(a)(3) is unconstitutional, it would not have deprived Former Commissioner Saul of the ability to delegate power to others to decide Plaintiff's benefit claim because of the doctrine of severability. As the Supreme Court noted in *Seila Law*, "'one section of a statute may be repugnant to the Constitution without rendering the whole act void.'" 140 S.Ct. 2208 (quoting *Loeb v. Columbia Township Trustees*, 179 U.S. 472, 490 (1900)). Indeed, even in the absence of a severability clause, when "'confronting a constitutional flaw in a

---

[6] The Undersigned does not accept Plaintiff's assertion in her Reply that the Commissioner waived any defense to her separation of power claim with regards to the Appeals Council by failing to address that claim in the Memorandum in Opposition. (Doc. 21 at 10–11). Plaintiff only cursorily mentioned the Appeals Council in her Statement of Errors (Doc. 15 at 15–16), and again, failed to provide the Commissioner with fair notice of her Constitutional claim in her Complaint (Doc. 1– 2; Doc. 4). In any event, the claim lacks merit with regard to the Appeals Council for the same reasons that the claim lacks merit with regard to ALJ Lesperance.

statute, [the Supreme Court tries] to limit the solution to the problem, severing any problematic portions while leaving the remainder intact.'"  *Id*. (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd*., 561 U.S. 477, 508 (2010)).  For that reason, in *Seila Law*, the Supreme Court found that the unconstitutional removal provision was severable from the remainder of the CFPB's governing statutes because the CFPB was capable of functioning independently even if the unconstitutional removal provision was stricken.  140 S.Ct. at 2209–10, 2245.  Such is the case here.  If the removal provision in § 902(a)(3) is stricken, the Social Security Administration would remain fully functional.  *Alice A. v. Comm'r of Soc. Sec.*, Case No. C20-5756, 2021 WL 5514434, *6 (W.D. Wash. Nov. 24, 2021) (finding that plaintiff's separation of powers claim failed, in part, because even if § 902(a)(3) was unconstitutional it was severable from the remainder of the statutes governing the Social Security Administration); *Shaun A. v. Comm'r of Soc. Sec*., Case No. C21-5003-SKV, 2021 WL 5446878, *4 (W.D. Wash. Nov. 22, 2021) (same); *John R. v Comm'r of Soc. Sec*., 2021 WL 5356719, *8 (same).

In addition, even if the removal provision in § 902(a)(3) is unconstitutional, that would not have automatically rendered Former Commissioner Saul's appointment invalid, and thus, it would not have automatically invalidated his actions, including delegating authority to make benefits determinations or ratifying such delegations.   In *Collins*, the Supreme Court found the unconstitutional removal provision did not render the FHFA's appointments invalid, and thus did not automatically void the FHFA's actions under the Director.  141 S.Ct. 1787 ("Although the statute unconstitutionally limits the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.  As a result, there is no reason to regard any of the actions taken by the FHFA [that were challenged on appeal] as void.")   Accordingly, infirmities in removal provisions do not automatically void

appointments or actions taken by properly appointed officials. *Alice A. v. Comm'r of Soc. Sec.*, 2021 WL 5514434, *6 (finding that '[t]he infirm *removal* provision does not render Commissioner Saul's *appointment* invalid, which in turn does not render the ALJ's disability determination void.") (emphasis in original); *John R. v Comm'r of Soc. Sec*., 2021 WL 5356719, *8 (finding that the unconstitutional "removal provision does not render the Commissioner's appointment invalid, and thus does not automatically void the SSA's actions under the Commissioner").

Instead, to obtain reversal of an agency decision, a plaintiff must show "compensable harm" flowing from an unconstitutional removal clause. *Collins*, 141 S.Ct. 1788–89 (remanding for further proceedings to determine whether compensable harm to Plaintiff occurred due to the President's inability to remove a Director of the FHFA except for cause). Here, Plaintiff makes no such showing. Plaintiff asserts that her injuries flow from an illegitimate delegation of power, that her harm involves "government actors exercising power which they did not lawfully possess," and that therefore, her harm should be presumed. (Doc. 21 at 16). In so doing, Plaintiff appears to conflate issues that might have presumably flowed from the unconstitutional *appointment* of Former Director Saul with a provision allowing for his unconstitutional *removal*. As explained above, however, appointments are not nullified by an unconstitutional removal provision. Nor are actions taken by a properly appointed official.

In short, Plaintiff has not pointed to a connection between any unconstitutional limit on Former Director Saul's removal and the ALJ's determination denying her benefits. *See also Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1138 (9th Cir 2021) (find that "there is no link between the ALJ's decision awarding benefits and the allegedly unconstitutional removal provisions. And nothing commands us to vacate the decisions below on that ground.") Nor is it likely that Plaintiff could do so, given that any particular ALJ or Appeals Council decision would

not concern the President. *Cf. Collins*, 141 S.Ct. at 1802 (Kagan, J. concurring) ("The SSA has a single head with for-cause removal protection . . . But . . . I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone . . . . When an agency decision would not capture a President's attention, his removal authority could not make a difference.").

For all these reasons, the Undersigned finds that Plaintiff's separation of powers claim lacks merit. Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **AFFIRM** the Commissioner's non-disability determination and that this matter be **DISMISSED**.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: February 17, 2022                    /s/ Kimberly A. Jolson
                                           KIMBERLY A. JOLSON
                                           UNITED STATES MAGISTRATE JUDGE